KEVIN V. RYAN (CSBN 118321)
United States Attorney

EUMI L. CHOI (WVBN 0722)
Chief, Criminal Division

STEPHEN H. JIGGER (CSBN 219430)
BARBARA BRENNAN SILANO (MASSBAR 055540)
Assistant United States Attorneys

450 Golden Gate Avenue
San Francisco, Ca. 94102
Tel: (415) 436-7223/6831
Steve.Jigger@usdoj.gov
Barbara.Silano@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | No. CR-06-0316 MHP |
| Plaintiff, ) | ORDER REGARDING DETENTION |
| ) | PURSUANT TO 18 U.S.C. § 3142 |
| v. ) | |
| RAFAEL RAMIREZ, ) | |
| Defendant, ) | |
| _____ ) | |

On May 2, 2006, the Grand Jury for the Northern District of California returned an indictment charging defendant Rafael RAMIREZ and eighteen others with conspiracy to distribute methamphetamine and cocaine in violation of Title 21 U.S.C. § 846. The indictment also charges RAMIREZ with nine substantive counts of distribution of methamphetamine in violation of Title 21 U.S.C. § 841(a)(1). The conspiracy count and seven of the substantive counts carry a minimum mandatory sentence of ten years to life in prison. Therefore, there is a rebuttable presumption that he is both a flight risk and a danger. See 18 U.S.C. §3142 (e).

DETENTION MEMORANDUM                    1

On May 10, 2006, the Court conducted a detention hearing in the above-captioned case for defendant RAFAEL RAMIREZ. During the hearing, the government proffered that RAMIREZ is involved in a Mexican drug trafficking organization based in Guadalajara, Mexico, which is headed by Anthony Quintana. The government proffered that its year-long investigation revealed that in that role, RAMIREZ supervised the management, sale, and delivery of hundreds of pounds of methamphetamine and hundreds of kilograms of cocaine as well as the collection of millions of dollars in proceeds from drug trafficking. The government also proffered that because RAMIREZ has a prior felony conviction, his minimum mandatory sentence in this case is doubled to twenty years to life imprisonment. According to the proffer, the drug weight of the narcotics he is alleged to have distributed is almost twenty times higher than the drug weight necessary to trigger a level 38. The lengthy sentence he faces if convicted gives him an incentive to flee.

The evidence of RAMIREZ's border crossings to date provide evidence that he is a flight risk. Between June 29, 2005 and March 12, 2006, the United States Customs and Immigration Office documented at least five (5) border crossings for RAMIREZ.[1] At the hearing, the government introduced transcripts from court authorized wiretaps evidencing that RAMIREZ orchestrates his travel to Mexico in a surreptitious manner. On November 12, 2005, RAMIREZ was intercepted planning a meeting with co-defendant ARAIZA. RAMIREZ drove from San Francisco to San Diego, California to meet ARAIZA. RAMIREZ was intercepted explaining to ARAIZA that he would cross into Mexico on foot. Approximately one half hour later, RAMIREZ contacted ARAIZA to tell him he had crossed over and was on the other side now. Law enforcement border crossing records show no documentation of the fact that RAMIREZ had either exited the United States or returned.

---

[1] RAMIREZ's passport also reflects extensive international travel to locations in Mexico, England, Brazil, India, and China.

More recently, on March 9, 2006, Ramirez further demonstrated his sophisticated understanding of the government's ability to monitor border crossings and his determination not to be deemed a "flight risk" upon apprehension. In a conversation with Dan Morgan, RAMIREZ explained his often roundabout travel to Mexico. According to Ramirez, because the government monitors air travel he does not travel to Mexico directly. Rather he flies to a border city within the United States and simply walks back and forth across the border. He does so, by his own admission, in order to avoid being determined to be a "flight risk" if ever apprehended. He noted that the inconvenience of indirect travel is the "price of doing business."

Further, RAMIREZ has significant connections, family and financial resources in Mexico. First, interceptions of RAMIREZ and Quintana reveal that RAMIREZ is at ease with Quintana and has visited Quintana's home on trips to Mexico.[2] Second, RAMIREZ is fluent in Spanish and has family in both Mexico and France. Third, RAMIREZ possesses the financial ability to flee. During the course of the investigation, agents seized from RAMIREZ and his co-defendants narcotics constituting over two million doses of methamphetamine with a wholesale value of approximately $3.7 million. The drug ledger of RAMIREZ, seized at the time of his arrest, indicate that the amount of drugs seized was just a small portion of the narcotics he was responsible for distributing. According to the proffer of the government, RAMIREZ routinely and repetitively acquired $250,000 worth of methamphetamine. The organization also dealt in large quantities of cocaine as evidenced by a 50 kilogram seizure. That money represents potential profits available to RAMIREZ that he could use to flee and/or compensate sureties for any value lost if RAMIREZ failed to appear. The government proffers that

---

[2] The government proffered that Quintana is a U.S. citizen who relocated to Mexico in the face of an outstanding U.S. warrant. Despite his fugitive status, he continues to direct drug shipments from Mexico, and the government suggests that RAMIREZ could potentially take up operations in Mexico and continue to direct shipments into the United States.

DETENTION MEMORANDUM 3

the organization appears to have been a lucrative business dealing, primarily, in cash: a co-defendant known to transport narcotics back and forth from Mexico for the organization was stopped and the vehicle was over $1,300,000 in cash. In addition, it appears that RAMIREZ lacks a legitimate source of income, which also contributes to the defendant's risk of flight. On May 3, 2006, when the defendant's wife was interviewed, she confirmed that her husband has relatives in Guadalajara, Mexico. The Court notes from the pre-trial services report that agents also seized approximately $50,000 from RAMIREZ's residence, but that during the interview, the defendant's wife stated that she had no idea where the money had come from.

According to the proffer of the defendant, he acknowledges that his family has substantial wealth in Mexico and is a well established family there. Unusually, the defendant proffered that if he were to flee the government could extradict him. The Court does not find that argument persuasive. The Court acknowledges that the family has proposed substantial sureties and has considered that the parents' home and, apparently, an apartment building could be used to secure the defendant's release. However, even a substantial secured bond does not offset the significant risk of flight in light of RAMIREZ's substantial incentive to flee and his connections and resources in Mexico.

Even though RAMIREZ is no longer in possession of his passport, according to the State Department, a person does not need a passport to either drive or fly from the United States to Mexico; he merely needs some form of photo identification. In any event, the border is porous, as Defendant's own wiretapped conversations indicated. It is likely that RAMIREZ could flee to Mexico and that his wife and children could join him there.

Similarly, the criminal history of RAMIREZ demonstrates that he is unlikely to abide by any conditions of release that the court might set. He has a prior drug felony which increases his exposure in this case to a minimum mandatory twenty years to life imprisonment. Of particular note, in a proceeding where the Court must rely, in part, on the defendant's assurance that he will remain in the jurisdiction for trial is the fact that

DETENTION MEMORANDUM 4

1  RAMIREZ has been convicted of the felony of perjury.  His criminal record also
2  demonstrates a disrespect for the rule of law and for leniency shown to him in the past.
3  While on probation for a conviction for theft of credit card data in 1991, he committed the
4  offense of perjury.  While on probation for the offense of receiving stolen property, he
5  committed the offense of Transportation and Sale of Narcotics.  His criminal history is
6  both a strong indicator of the defendant's inability and/or unwillingness to live by
7  conditions set by the court, and an equally strong incentive for the defendant to flee.

Although the strength of the evidence is the least important factor in determining whether there are conditions of release which will assure the appearance of the defendant in court, the court notes that the evidence, as proffered by the government, is strong in this case.

Based on the factors above, the government has shown by a preponderance of the evidence that RAMIREZ presents a serious risk of flight, and by clear and convincing evidence that RAMIREZ would pose a danger to the community if he were released in any manner.   THEREFORE, the Court ORDERS that he be detained.

IT IS FURTHER ORDERED THAT, the defendant is committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; and

IT IS FURTHER ORDERED THAT the defendant be afforded reasonable opportunity for private consultation with counsel; and

IT IS FURTHER ORDERED THAT on ORDER of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined, deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

DATED: May 30, 2006

_____
HON. ELIZABETH D. LAPORTE
UNITED STATES MAGISTRATE JUDGE

DETENTION MEMORANDUM                              5